UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURA BOGDAN, Guardian on behalf of
Patrick Terry,                                          Case No. 05-72186

         Plaintiff,                                 Honorable Nancy G. Edmunds

v.

SERVICE SPECIALTIES II, INC., ET AL.,

         Defendants.
_____/

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [17]
AND DENYING DEFENDANTS' MOTION FOR RULE 11 AND/OR 28 U.S.C. § 1927
SANCTIONS [26]**

This is a housing discrimination lawsuit brought by the Guardian of an adult mentally-

disabled tenant.  It is alleged that the tenant was discriminated against and harassed

because of his disability.  Specifically, the case arises out of a March 2, 2005 lease

agreement between Plaintiff Laura Bogdan, as Guardian for her adult disabled son Patrick

Terry (hereinafter "Plaintiff"), and  Defendant Service Specialties II, Inc. as agent for

Defendant Richard A. Davis, owner of the leased property on Lakeworth in Roseville,

Michigan.  It is not disputed that, at the time the one-year lease was executed, Service

Specialities knew that Mr. Terry was disabled and that a caregiver would be on the leased

premises around the clock providing for his required care.

On June 3, 2005, Plaintiff filed a complaint alleging that Defendants discriminated

against and harassed Mr. Terry because of his disability and thus violated the Fair Housing

Act, as amended, 42 U.S.C. §§ 3604(c), and (f)(2), by:  (1) requesting on May 4, 2005 that

the Roseville police investigate the leased property for suspected criminal activity; (2) failing to approve an additional tenant; and (3) serving a notice to quit on May 6, 2005. Defendants have taken no action to enforce the notice to quit, and Mr. Terry and another disabled individual currently reside at the Lakeworth rental property.

This matter is presently before the Court on Defendants' motions for summary judgment and for sanctions. Defendants' motion for summary judgment is GRANTED because Plaintiff presents no admissible direct or circumstantial evidence showing Defendants intentionally discriminated against Mr. Terry because of his disability or pretext. Defendants' motion for sanctions is DENIED because Defendants have not persuaded the Court that sanctions are warranted.

## I.    Facts

### A.  Background

Defendant Service Specialties II, Inc. ("Service Specialties") is a Macomb County, Michigan business that manages property, employs between 15-22 people, and currently leases at least one home, other than the Lakeworth home at issue here, to a group of disabled persons. (Bott Dep. at 12, 94-96; Young Dep. at 9-11.)

Defendant Catherine Bott, a licensed real estate broker, is the president of the Service Specialties. (Bott Dep. at 8-9.)

Defendant Richard Davis is the owner of the leased property on Lakeworth in Roseville, and a client of Service Specialties. He has delegated all responsibility for the management of this investment property to Service Specialties and is not a signatory on the lease with Plaintiff. (Davis Dep. at 12-13.) Rather, it was executed by his agent,

2

Service Specialties.  Mr. Davis was never consulted on whether to approve or disapprove the rental of the leased premises on Lakeworth.  (Davis Dep. at 9, 12-13.)

Patrick Terry is a 24-year old mentally-disabled male who requires 24-hour care. Plaintiff Laura Bogdan is his mother and guardian.

From 1999 until January 4, 2005, Mr. Terry was a resident at a State-licensed group home known as Meadowdale and located at 38605 Meadowdale, Clinton Township, Michigan.  (Bogdan Dep. at 130-31.)  On December 28, 2004, the Director of Macomb Family Services wrote to the Macomb Oakland Regional Center ("MORC"), giving them a 30-day notice to have Mr. Terry moved from Meadowdale by January 27, 2005, because of Mr. Terry's increased aggression.  (Defs.' Ex. D, 12/28/04 ltr.)  MORC is a non-profit human service agency that provides housing and support services for adults and children with developmental, physical, health, or psychiatric disabilities.  (See www.morcinc.org.)

On January 4, 2005, the Clinton Township police were called to Meadowdale in response to a report that Mr. Terry had damaged windows and other household items and had physically assaulted multiple persons inside the home.  (Defs.' Ex. E, 1/4/06 Pet. for Hospitalization.)  Four police officers transported Mr. Terry in handcuffs to Mt. Clemens General Hospital for treatment.  (Bogdan Dep. at 19-21.)

On January 4, 2005, Mr. Terry's mother and guardian took him to her home.  (Bogdan Dep. at 21.)  He resided with her at her home in St. Clair Shores, Michigan, until March 2, 2005, when he moved into the leased premises on Lakeworth in Roseville, Michigan (a neighboring suburb).

3

**B. Lease Application and Lease Agreement**

Plaintiff executed a lease application on February 28, 2005, as co-applicant with Mr. Terry.  (Defs.' Ex. S, 2/28/05 Rental Application.)   She indicated that Mr. Terry was currently living with her, and had been since January 1, 2005.  (*Id.* at 1.)  On page 2 of the application, she answered "No" to the question whether Mr. Terry had ever been evicted from tenancy.  (*Id.* at 2.)  It is not disputed that Plaintiff failed to inform Defendants that Mr. Terry had been forced to leave the Meadowdale group home because of his increased aggressive behavior toward other people and physical property.  Plaintiff testified that she did not consider that information to be important and considered the complaints about Mr. Terry's aggressive behavior to be dubious and/or false.  (Bogdan Dep. at 31-34, 46-49.)

It is not disputed that Service Specialties leased the Lakeworth home to Plaintiff knowing that Mr. Terry was handicapped and that one or more caregivers would be at that residence 24-hours a day, providing Mr. Terry with the care he required.  (Young Dep. at 14-15; Bogdan Dep. at 64).

Plaintiff testified that, at the time she applied for and at the time she signed the lease agreement, she told Service Specialties employees that she wanted two other disabled adult males to join her son as roommates, and she negotiated to have two more residents at the Lakeworth property.  She also testified that she did not want to be the only person held accountable under lease, and confirmed with these Service Specialties employees that in order to share responsibility for the lease she would have to provide them with the full name and social security number of the additional tenant and signatory to the lease as well as $20 for a credit check and get Service Specialties' approval.  (Bogdan Dep. at 26-29, 56-57, 68-69, 71,75, 81-83, 118, 215-218.)

4

Despite testimony that this was her intent, Plaintiff did not inform anyone at Service Specialties that she was leasing the Lakeworth home so that it could be operated as a semi-independent placement (SIP) home supported by Independent Opportunities of Michigan ("IOM")[1] and MORC.  (Defs.' Ex. H, 3/1/05 MORC authorization of first month's rent and security deposit to Patricia Massey at IOM and 3/2/05 $2,375.00 check from IOM to Service Specialties indicating that it is for "1st Month's rent for Lakeworth <u>SIP</u> Plus Deposit"; Bogdan Dep. at 83; Huff Dep. at 121; Cottle Dep. at 21-22.)  It was Service Specialties' understanding that it was leasing the premises to Laura Bogdan, not to MORC or IOM.  (Bott Dep. 33, 112-113; Cottle Dep. 21-22; Ex. K., Cottle 3/11/05 letter to IOM stating that it was a pleasure to help IOM find suitable rental property "for Laura Bogdan.")

The one-year lease and addendum were executed on March 2, 2005, identifying Laura Bogdan and Patrick Terry as lessees and residents.  (Pl.'s Ex. 2.)  The lease agreement provides that "[t]he premises shall be used exclusively as a residence for no more than <u>3</u> persons", and that  the "Resident shall not assign the agreement or sublet any portion of the premises without prior written consent of Landlord."  (*Id.* at ¶¶ 5, 9.)  Under the addendum to the lease, the residents similarly agreed to use the leased premises solely for residential living purposes and not to assign the lease or sublet the premises without first obtaining "Management's written consent."  (*Id.* at 1.)  They also agreed that:

> Management is not obligated to allow assignment or subletting of this Lease, but will make every effort to approve a new Resident.  All sublet or replacement Residents <u>must</u> be qualified and approved through Landlord's normal qualification process.

---

[1]IOM is a Michigan agency approved by MORC to provide support for special needs individuals, including care provided in group and SIP homes.  (Bogdan Dep. at 82; Defs.' Ex. L, IOM information sheet.)

(*Id.* at 1.)

### C. Events Triggering Lawsuit

A number of events occurred in late April/early May, 2005, resulting in Plaintiff filing this lawsuit on June 3, 2005.

During that time period, Service Specialties received complaints from Lakeworth neighbors about heavy traffic, loud noise, and people drinking and hollering outside the leased home at all hours of the night.  (Young Dep. at 44-48; Blanco Dep. at 30-33). Another Service Specialties employee notified Catherine Bott that, when she was showing a home located across the street from the Lakeworth property, she had observed heavy vehicle traffic coming and going from the property and erratic driving by someone who entered that property.  (Vercruysse Dep. at 22-28.)

Defendant Bott, relying on experience gained during years of managing leased properties, was concerned that the described conduct was indicative of criminal activity and asked the Roseville police to investigate.  (Bott Aff. at ¶ 5.)

On May 4, 2005 at 1:30 in the afternoon, the Roseville police went to the Lakeworth home to investigate.  Patrick Terry's caretaker allowed the police to enter the leased premises. They found no evidence of criminal activity, closing the investigation after filing a May 12, 2005 report.  (Pl.'s Ex. 5, 5/4/05 incident report and 5/12/05 Supplemental Report.)  Defendants subsequently learned that Brandon Walker, one of Mr. Terry's caregivers and the IOM staff person managing the Lakeworth home, was suspected of theft and was incarcerated in June 2005.  (Bogdan Dep. at 168; Huff Dep. at 68-70; Defs.' Ex. X, Brandon Walker Criminal Record.)

On May 6, 2005, Catherine Bott received a phone call from Tamara Pruitt, an employee of MORC and Mr. Terry's caseworker.  Tamara Pruitt made a report of her call to Bott.  Pruitt had called Service Specialties to inquire about their policy for adding an additional tenant to  the lease for the "Lakeworth SIP", and Ms. Bott told her that "Ms. Bogdan promised that no one else was moving into the home" and that Bott would not authorize anyone else to move in.  Ms. Bott also told her that "Ms. Bogdan was attempting to 'run a group home and I would have never entered this agreement if I knew it was a group home'" and Service Specialties "will proceed with eviction if there are any attempts to move anyone else in the home."  (Pl.'s Ex 4, 5/6/06 MORC internal report.)

After Ms. Bott told Pruitt that the lease with Plaintiff did not allow the Lakeworth premises to be run as a group home, this MORC employee called Plaintiff.  (*Id.*)  Plaintiff testified that she then called Ms. Bott herself and was told basically the same thing; i.e., that the Lakeworth lease was not for a group home.  Ms. Bott also told Plaintiff that she would be filing a notice to quit.   (Bogdan Dep. at 29-32.)

Plaintiff then called Marianne Huff, an advocate for Michigan Protection & Advocacy Service, Inc. ("MPAS"), and asked her to call Ms. Bott.  (Huff Dep. at 6-7; 86-87.)  Ms. Huff testified that she did so.  She told Ms. Bott that she was calling on behalf of Plaintiff and Mr. Terry.  She told Bott that Plaintiff was not running a group home at the Lakeworth residence and tried to explain the difference between group and SIP homes.  (Huff Dep. at 8.)   She also told Bott that Plaintiff had not filed a fraudulent application even though she had not yet reviewed Plaintiff's application.  (Huff Dep. at 15-16.)  Huff further testified that Ms. Bott said she was going to issue a notice to evict and "something to the effect of if I had known

7

that those kind of people were going to be living there, she would have had to consult with her corporation counsel."  (Huff Dep. at 8-9.)

On May 6, 2005, Ms. Bott also called Brian Kilgore, Farm Bureau Insurance Co. agent for the property located at 20281 Lakeworth, Roseville, Michigan.  (Kilgore Aff. ¶¶ 2-3.) She asked the insurance agent about the status of the "insurance coverage pertaining to a group home facility or adult foster care facility."  (Pl.'s Ex. 13, 5/6/05 letter.)  He informed Bott that:

> Farm Bureau will not continue your policy if the aforementioned activities continue.  The type of policy that is currently covering your home from a landlord standpoint is not designed nor rated to offer coverage for this type risk.  I ask that you discontinue this activity immediately or a company cancellation of coverage will follow.

(Pl.'s Ex. 13, 5/6/05 letter.)

Mr. Kilgore avers that the same conclusion would apply to the Lakeworth residence's use as a SIP home, rather than a group or adult foster care home.  (Kilgore Aff. ¶ 3.)  He further avers that Ms. Bott at no time suggested, inferred or stated "that she wanted to use the issue of insurance coverage as an excuse to eliminate a use of this residence by handicapped individuals."  (Kilgore Aff. ¶ 6.)  Rather, Ms. Bott simply asked whether the home was insured for this particular purpose, and Mr. Kilgore replied that it was not. (Kilgore Aff. ¶ 6.)[2]  Ms. Bott similarly avers that she asked Mr. Kilgore to "learn whether or not the Lakeworth property has insurance coverage for the particular use to which the

---

[2]On June 13, 2005, Farm Bureau sent a second letter to the homeowner, Mr. Davis, in care of Service Specialties II, with notice that, as of July 16, 2005, the insurance policy on the Lakeworth residence would be cancelled "[b]ecause the use in question was not discontinued".  (*Id.* at ¶ 5; Defs.' Ex. B, 6/13/05 letter.)  Other insurance has subsequently been obtained and at a lower premium.  (Cottle Dep. 67-68.)

8

home was being submitted by Laura Bogdan and/or Patrick Terry." (Bott Aff. ¶ 3.) Her conduct was not motivated by discriminatory animus. Rather, it was motivated by the legitimate business concern about the availability of insurance coverage for a particular use of the leased premises. (Bott Aff. ¶¶ 3-4.) To show lack of bias on her part and that of her company, Ms. Bott avers that Service Specialties II presently manages another residence occupied by three handicapped individuals on Macel Street in Roseville, Michigan. (Bott Aff. ¶ 3.)

On May 6, 2005, Service Specialties mailed a notice to quit to Plaintiff informing her of its intent to evict her and Mr. Terry from the Lakeworth property by June 4, 2005 because of a "fraudulent application." (Pl.'s Ex. 6, 5/6/05 notice to quit.)

On May 13, 2005, Marianne Huff, the MPAS advocate, wrote to Ms. Bott at Service Specialties advising that "an additional tenant will be moving to the property located at 20281 Lakeworth within the next two weeks. At the time that the new tenant moves to the rental unit, MPAS will notify you of the tenant's name and the name of his legal guardian." (Defs.' Ex. P, 5/13/05 letter.) It is undisputed that neither Ms. Huff nor anyone else provided Defendants with the name of the disabled adult male or his guardian before moving him into the Lakeworth residence in early June 2005. (Bogdan Dep. at 74-76, 81-85.)

On May 13, 2005, an attorney with MPAS, Mr. Davis, also wrote to Ms. Bott at Service Specialties. He advised that he was representing Plaintiff and her ward, Mr. Terry and asked for Plaintiff's rental file as well as the basis for the allegation that Plaintiff had filed a "fraudulent application." (Pl.'s Ex. 8, 5/13/05 letter.) He further advised that Plaintiff believed that the notice to quit was issued because of Mr. Terry's disability and because

9

of the race of his caregivers, who were African American. Plaintiff's counsel demanded that Defendants "stop the termination of tenancy and harassing behavior immediately", advising that failure to do so "will result in legal action." (*Id.*)  Plaintiff's counsel also asked Defendants to have their legal counsel contact him within 10 days. (*Id.*) Ms. Bott testified that she contacted her attorney after she received this letter.  (Bott Dep. at 124.)

It is undisputed that Defendants never followed up on the Notice to Quit.  Mr. Terry and Tom Wichowski, both handicapped individuals, continue today to reside at the residence.

On June 3, 2005, Plaintiff filed this action alleging that Defendants discriminated against and harassed Mr. Terry because of his disability and thus violated the Fair Housing Act, as amended, 42 U.S.C. §§ 3604(c), and (f)(2).

**II.   Summary Judgment Standard**

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue

10

for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

This matter is presently before the Court on Defendants' motions for summary judgment and for sanctions.  This Court first addresses the motion for summary judgment arguing that Plaintiff has failed to come forward with admissible direct or circumstantial evidence showing Defendants' intentionally discriminated against Mr. Terry because of his disability or pretext.

### A.  Fair Housing Act Claim

Plaintiff alleges that Defendants violated § 3604(f)(2) of the Fair Housing Act.  That section prohibits discrimination in the "terms and conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of . . .  a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available. . . ."  42 U.S.C. § 3604(f)(2)(B) (emphasis added).  Specifically, Plaintiff argues that Defendants intentionally discriminated against Mr. Terry because or his disability when they:  (1) filed an incident report with the Roseville

Police Department on May 4, 2005; (2) issued the May 6, 2005 notice to quit; and (3) failed to approve an additional tenant, Tom Wichowski.

Intentional discrimination may be proved either by direct or circumstantial evidence. *Schanz v. The Village Apartments*, 998 F. Supp. 784, 788 (E.D. Mich. 1998). To establish intentional discrimination using circumstantial evidence, the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is applied. This Court first examines Plaintiff's alleged direct evidence of discriminatory intent.

### 1. Direct Evidence of Discriminatory Intent

If Plaintiff presents direct evidence of discrimination, there is no need for the Court to "go through the *McDonnell Douglas* burden-shifting analysis." *Rowan v. Lockheed Martin Energy Systems, Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). "Direct evidence is evidence that proves the existence of a fact without requiring inferences." *Rowan*, 360 F.3d at 548. Despite her arguments to the contrary, Plaintiff has not come forward with any "direct evidence" that Defendants discriminated against Mr. Terry because of his disability.

Plaintiff first proffers as direct evidence Ms. Huff's deposition testimony that Ms. Bott, in connection with her statements that she thought Plaintiff's lease application was fraudulent and that she was thus going to issue a notice to quit, said "something to the effect of if I had known that those kind of people were going to be living there, she would have had to consult with her corporation counsel." (Huff Dep. at 8-9.) Because inferences must be drawn to conclude that the notice to quit was motivated by Ms. Bott's intent to discriminate against Mr. Terry because of his disability, this cannot be considered direct evidence of that fact. *Rowan*, 360 F.3d at 548. As argued by Defendants, inferences could likewise be drawn from this statement that Bott had a legitimate business concern about

12

potential liability and thus would have consulted with her corporate counsel if she knew the Lakeworth residence was to be operated as a SIP home for multiple disabled adults with the support of IOM and MORC.

Plaintiff next proffers evidence that Ms. Bott told MORC employee, Tamara Pruitt, that she "would never have entered into this [lease] agreement [with Plaintiff] if I knew it was a group home."   (Pl.'s Ex. 4.)   This internal MORC report contains inadmissible hearsay. Moreover, it too requires inferences to conclude that Defendants issued the notice to quit because of Mr. Terry's disability.  Statements of concern over operation of the Lakeworth property as a group home do not directly prove that Ms. Bott issued the notice to quit or questioned the addition of another tenant because of Mr. Terry's disability.   In fact, Defendants were fully aware of Mr. Terry's disability when they agreed to lease the Lakeworth premises to Plaintiff.  The additional disabled adult male who is currently living at the Lakeworth property, Tom Wichowski, is not a party to this lawsuit.  Accordingly, Plaintiff does not have standing to assert claims of discrimination on his behalf, nor could she because Tom Wichowski is currently residing at the Lakeworth home.

Finally, Plaintiff proffers as direct evidence her deposition testimony that Ms. Bott likewise told her that "I am not running a group home. . . .  I am giving you a notice to quit." (Bogdan Dep. at 31.)  As discussed above, statements of concern over operation of the Lakeworth property as a group home do not directly prove that Ms. Bott issued the notice to quit or questioned the addition of another tenant because of Mr. Terry's disability.

### 2.  Circumstantial Evidence of Discriminatory Intent

13

To establish intentional discrimination using circumstantial evidence, a plaintiff "must first make *prima facie* showing of discrimination." *Schanz*, 998 F. Supp. at 788. The plaintiff does this by establishing: (1) membership in a protected class, (2) defendants' awareness of it, (3) plaintiff's willingness to accept the defendants' rental terms, and (4) defendants' refusal. *Id.* If the plaintiff establishes a *prima facie* case, the defendants "must respond with a legitimate, nondiscriminatory reason for the denial. . . ." *Id.* "If defendants put forth a legitimate, nondiscriminatory reason, plaintiff must then prove pretext. *Id.*

Defendants challenge Plaintiff's ability to establish a *prima facie* case. They first argue that the *prima facie* elements must be modified because Plaintiff already occupies the rental property. This Court agrees and thus offers the following modification. Plaintiff must show: (1) Mr. Terry is disabled, (2) Defendants knew it, (3) Plaintiff's willingness to enjoy all rights available under the lease; and (4) Defendants' interference. Contrary to Defendants' arguments, Plaintiff has established a *prima facie* case.

It is undisputed that Mr. Terry is disabled and that Defendants knew it. Plaintiff also presents evidence of her willingness to enjoy certain rights under the lease; i.e., her attempts to add another tenant <u>and</u> have another name (the tenant's guardian) added on the lease, and Defendants' objections to her doing so. Accordingly, Defendants are required to come forward with legitimate, nondiscriminatory reasons for their challenged conduct. Defendants have satisfied that burden.

As to the request for the Roseville Police to investigate, Defendants present evidence of neighbor complaints and that of Service Specialties' agent, Amy Vercruysse, of suspicious behavior. (Young Dep. at 44-48; Blanco Dep. at 30-33; Vercruysse Dep. at 22-

14

28; Bott Aff. at ¶ 5.)  This evidence is sufficient to show a legitimate nondiscriminatory reason to ask the police to investigate.

As to Defendants' issuance of the notice to quit and the rejection of Plaintiff's attempts to add an additional tenant, it is undisputed that Plaintiff did not inform Defendants of her intent to have the Lakeworth residence operate as a SIP home for three adult males, all sponsored by IOM and MORC.  (Bogdan Dep. at 83; Huff Dep. at 121; Cottle Dep. at 21-22;  Bott Dep. at 33, 112-113.)   Defendants present evidence of a legitimate, nondiscriminatory reason for each of the challenged acts; i.e., concern about an increased exposure to liability and the availability of insurance coverage for this undisclosed use of the leased property.  Bott asked the insurance agent for the Lakeworth residence if there would be coverage if it was used as a group or adult foster care facility, and the agent told her no.  (Pl.'s Ex. 13, 5/06/05 letter.)  The agent avers that, even if Ms. Bott had asked about use of the Lakeworth property as a SIP home, as opposed to a group or adult foster care home, the result would be the same – there would be no coverage for this use. (Kilgore Aff. ¶ 3.)  *See Wood v. Rathfelder*, 128 F. Supp.2d 1079, 1082 (N.D. Ohio 2000) (finding concern over potential liability and insurance coverage to be a reasonable, legitimate, nondiscriminatory reason to wish to end a tenancy).

Because Defendants have come forward with legitimate, nondiscriminatory reasons for their challenged conduct, the burden shifts to Plaintiff to show that Defendants' reasons are a mere pretext for intentional discrimination by Defendants against Mr. Terry because of his disability.  Plaintiff's attempts to prove pretext fail.

As to Defendants' asking the Roseville Police to investigate suspected criminal activity, Plaintiff offers only speculation in response to Defendants' evidence of

15

neighborhood complaints, Ms. Vercruysse's observations, and Ms. Bott's experience with similar complaints and rental property. Although Plaintiff acknowledges that Bott's request to the police and their investigation of the Lakeworth home came two days <u>before</u> the notice to quit was issued, she speculates, without supporting facts or evidence, that Bott intentionally misled the police when she said there was no eviction pending. Plaintiff ignores the fact that it was two days later, after Bott learned from a MORC employee that another MORC client was about to be added as a tenant in the Lakeworth home, that the notice to quit was issued. Plaintiff also speculates, without supporting facts, that misstatements in the Roseville Police incident report were intentionally made by Bott, rather than the reporting officer. She further speculates that Bott's motivation for doing so was her intent to discriminate against Mr. Terry because of his disability. As observed by the Sixth Circuit, "[m]ere personal beliefs, conjecture and speculation are insufficient to support an inference of . . . discrimination." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 584 (6th Cir. 2003) (internal quotes and citation omitted).

As to the notice to quit stating that Plaintiff had filed a fraudulent application in connection with the Lakeworth lease, Plaintiff does not present evidence that she disclosed in that application her intent to have the Lakeworth property operate as a SIP home for three adult disabled males, all sponsored by IOM and MORC. Again, Plaintiff presents only speculation in response to Defendants' evidence that there were legitimate, nondiscriminatory business reasons for concern over this omission; i.e., the potential for liability and the lack of insurance coverage for this undisclosed use of the Lakeworth home. Plaintiff merely speculates, without supporting evidence, that Bott intentionally gave the insurance agent inaccurate information – about the residence being used as a group or

16

adult foster home as opposed to a SIP home for disabled adult males.  As stated above, conjecture and speculation are insufficient to establish pretext.  *Wexler*, 317 F.3d at 584. Moreover, as further support that the notice to quit was issued for legitimate nondiscriminatory reasons, the Court observes that, although the original insurance policy with Farm Bureau was indeed cancelled, substitute coverage has been obtained for the Lakeworth property and Mr. Terry and the additional disabled male client of MORC who moved in the Lakeworth home in early June 2005 continue to reside there.

For the above-stated reasons, Defendants' motion for summary judgment is granted. The Court now addresses Defendant's motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure and/or 28 U.S.C. § 1927.

## B.  Sanction Request

Defendants seek sanctions, both under Rule 11 of the Federal Rules of Civil Procedure and under 28 U.S.C. § 1927, arguing that Plaintiff filed the complaint in this action without first making a reasonable inquiry whether the factual contentions have or are likely to have evidentiary support and whether the claims are warranted by existing law or by a nonfrivolous argument for an extension of the law.  Fed. R. Civ. P. 11(b)(2), (3). Defendants further argue that Rule 11 sanctions are appropriate because Plaintiff continues to make factually unsupported allegations in her response to Defendants' motion for summary judgment. Defendants also assert that they have satisfied the procedural requirements for Rule 11 sanctions because prior to filing they allowed "Plaintiff and her attorneys at least 21 days to withdraw their frivolous and/or false allegations."

### 1.  Rule 11 Sanctions

#### a.  Procedural Requirements

17

Subrule 11(c) requires that the party seeking Rule 11 sanctions must satisfy a twenty-one day "safe harbor" period.[3]   Accordingly, Defendants must show the Court that they satisfied Rule 11(c) by first serving their Rule 11 motion on Plaintiff, giving Plaintiff the adequate time to withdraw or correct the challenged claims, allegations, and contentions they identified in their Rule 11 motion.   Defendants assert that they have "complied with provisions of Fed. R. Civ. P. 11 by, among other things, prior to filing allowing Plaintiff and her attorneys at least 21 days to withdraw their frivolous and/or false allegations."  (Defs.' Mot. ¶ 2.)  Defendants, however, fail to provide the Court with proof that they did as they allege.  Absent proof that the safe harbor provisions were satisfied, this Court cannot award Rule 11 sanctions.  *Ridder v. City of Springfield*, 109 F.3d 288, 296 (6th Cir. 1997).

### b.  Substantive Requirements

Assuming that Defendants' counsel can produce evidence showing that it complied with Rule 11's safe harbor provisions, this Court considers its substantive arguments.

---

[3]Fed. R. Civ. P. 11(c)(1)(A) provides that:

A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b).  It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.  If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion.  Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.

18

Federal Rule of Civil Procedure 11(b) provides that:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, --
>
> * * *
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11(b)(2), (3).  "Rule 11 sanctions are warranted if the attorney's conduct was unreasonable under the circumstances." *Andretti v. Borla Performance Industries, Inc.*, 426 F.3d 824, 833 (6th Cir. 2005).  The "imposition of sanctions for violations is discretionary, rather than mandatory." *Ridder*, 109 F.3d at 293-94.

The Court first examines Defendants' argument that Plaintiff filed her complaint without making a reasonable inquiry into the facts.  Considering that Defendants' counsel had not responded to Plaintiff's counsel's letter of May 13, 2005 seeking information and threatening suit and that the notice to quit stated an intent to evict on June 4, 2005, it was not unreasonable for Plaintiff's counsel to file a complaint on June 3, 2005, alleging facts that it believed were likely to have evidentiary support based upon its investigation at that time.  Accordingly, Rule 11 sanctions are not warranted based on Plaintiff's decision to file a complaint.

Defendants next argue that they are entitled to Rule 11 sanctions because, after substantial discovery and the filing of their motion for summary judgment, Plaintiff

19

continued to make allegations in her response that had no evidentiary support. As discussed above, this Court, applying the *McDonnell Douglas* burden-shifting framework, has determined that: (1) Plaintiff established a *prima facie* case of discrimination, (2) Defendants came forward with legitimate, nondiscriminatory reasons for asking the police to investigate the Lakeworth residence for criminal activity, for issuing the notice to quit, and for insisting on more information from the insurance agent for that property before allowing additional disabled adults to reside on the Lakeworth premises, and (3) Plaintiff failed to come forward with evidence proving these reasons were a mere pretext for intentional discrimination against Mr. Terry because of his disability.

Defendants argue that, because Plaintiff's response relies on factually unsupported assumptions and speculation to support her pretext arguments, they are entitled to Rule 11 sanctions. Although this presents a close question, the Court will not award Rule 11 sanctions. Considering Plaintiff's claims as a whole and the fast pace of the events that gave rise to those claims, this Court concludes that Plaintiff's counsel's conduct was reasonable under the circumstances.

### 2. Sanctions Under 28 U.S.C. § 1927

Defendants also seek excess costs, expenses, and attorneys fees under 28 U.S.C. § 1927, which provides that:

> Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

An award of sanctions under § 1927 is discretionary. *Holmes v. City of Massillon*, 78 F.3d 1041, 1049 (6th Cir. 1996). In the Sixth Circuit, § 1927 sanctions are warranted "when an

20

attorney has engaged in some sort of conduct that, from an objective standpoint, falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party." *Id.* (internal quote and citation omitted). "[T]he attorney's misconduct, while not required to have been carried out in bad faith, must amount to more than simple inadvertence or negligence that has frustrated the trial judge." *Id.* "Under this formulation, the mere finding that an attorney failed to undertake a reasonable inquiry into the basis of a claim does not automatically imply that the proceedings were intentionally or unreasonably multiplied." *Ridder*, 109 F.3d at 298.

In light of the timing of Defendants' motion for sanctions and their motion for summary judgment, this Court finds that § 1927 sanctions are not warranted. This Court does not consider Plaintiff's response to Defendants' motion for summary judgment to constitute an intentional, vexatious, or unreasonable multiplication of the proceedings. Accordingly, Defendants' motion for § 1927 sanctions is denied.

## IV.  Conclusion

For the above stated reasons, Defendants' motion for summary judgment is GRANTED, and Defendants' motion for sanctions is DENIED.

s/Nancy G. Edmunds_____
Nancy G. Edmunds
United States District Judge

Dated:  May 25, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 25, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer_____
Case Manager

21